**In re Odell COTTRELL, Debtor.**

**Odell COTTRELL, Appellant,**

v.

**UNITED STATES of America, for the United States Department of Agriculture, Rural Housing Services, f/k/a Farmers Home Administration, Appellee.**

**Civil Action Nos. 97–T–015–N, 97–T–016–N.**

United States District Court,
M.D. Alabama,
Northern Division.

Aug. 25, 1997.

Thomas E. Haigh, Troy, AL, William Z. Messer, Legal Services Corporation of Alabama, Montgomery, AL, for Odell Cottrell.

Kent B. Brunson, Redding Pitt, U.S. Attorney, U.S. Attorney's Office, Montgomery, AL, Steven J. Youngpeter, Office of the General Counsel, Montgomery, AL, for U.S.

Curtiss Cleveland Redinf, Jr., Montgomery, AL, trustee.

## MEMORANDUM OPINION

MYRON H. THOMPSON, Chief Judge.

In these two appeals, appellant Odell Cottrell seeks review of the decision of the United States Bankruptcy Court for the Middle District of Alabama granting the motion for relief from automatic stay, submitted by appellant Rural Housing Services (RHS) of the United States Department of Agriculture, to allow eviction of the debtor Cottrell, and the decision denying and dismissing Cottrell's petition for Chapter 13 bankruptcy. United States District Courts are granted jurisdiction over appeals from bankruptcy courts pursuant to 28 U.S.C.A. § 158(a). Because of the interconnectedness of these two appeals, they were consolidated for consideration by this court in an order entered February 14, 1997. Upon consideration of the record, this court affirms the decisions of the bankruptcy court.

## I. STANDARD OF REVIEW

Acting in an appellate capacity, the court reviews the factual findings of the bankruptcy court under a "clearly erroneous" standard. *In re Patterson*, 967 F.2d 505 (11th Cir.1992). Questions of law are reviewed de novo. *Id.*

## II. BACKGROUND

Cottrell purchased her home in Troy, Alabama, in April 1984, for $30,500, financed by a mortgage through RHS.[1] Under the policies of RHS, Cottrell was entitled to and received interest credit assistance during her ownership of the home.

Until 1995, Cottrell worked full time as a cook. At that time, she became unable to work due to health problems and became delinquent in her mortgage payments. In July 1995, she applied for Social Security disability benefits. Cottrell then met with the county supervisor for the Pike County RHS office.: She told the supervisor of her health problems, gave the supervisor a statement from her doctor, and advised the supervisor that she had applied for disability benefits. Cottrell's income had declined to the amount she receives under the Aid for Dependent Children program.

Cottrell, who is unable to read or write, asked the supervisor if she could receive a

---

1. RHS was then called the Farmers Home Administration, but for convenience and clarity will be referred to as RHS throughout this opinion.

"moratorium" under RHS regulations, which would allow her to suspend payments on her home pending a decision on her disability benefits application. She had received moratorium relief on two occasions nine years earlier, and had requested but been denied such relief on another occasion, within the year preceding this request, but before leaving her employment.

According to Cottrell, the supervisor told her that she could not get a moratorium because she had already received too many. The supervisor made this representation again later at another meeting between Cottrell and the supervisor, with Cottrell's son present. Cottrell did not fill out or sign an application for a moratorium, nor was she told that she had a right to apply, and a right to appeal an adverse decision.

At trial, RHS did not offer testimony to challenge this account of the meetings, but presented the "running record" of notations on cases made the day of the meetings. The entry on the relevant day indicates that Cottrell was "[a]dvised of interest credit, moratorium, right to sell." It does not indicate that a moratorium application was entered, but rather that Cottrell was "[a]dvised she must pay account current in thirty days." The implication is that, otherwise, RHS would foreclose the mortgage.

In the fall of 1995, the mortgage was sufficiently delinquent to result in the acceleration of her account for foreclosure. A letter advising Cottrell of that development was sent by certified mail to her, but to her former home address, which she had notified RHS had been changed. Nevertheless, the return receipt was signed by her daughter. The letter states, in bold on page one:

"IMPORTANT. IF YOU DO NOT ASK FOR A HEARING, YOU WILL PROBABLY LOSE YOUR HOUSE. YOU CAN HAVE A LAWYER HELP YOU AT THIS HEARING. IF YOU WANT A LAWYER TO HELP YOU, YOU SHOULD CONTACT HIM IMMEDIATELY."

Cottrell testified that her children told her she had received a letter telling her that her house would be foreclosed and that she took the letter to her lawyer. It is undisputed that Cottrell did not request a hearing.

On May 9, 1996, the foreclosure sale was carried out late in the afternoon. The RHS made the only bid on the property, purchasing it for $20,400. The "certificate of sale" was completed the following day, May 10. On that same day, Cottrell filed a Chapter 13 bankruptcy petition.

RHS filed a motion for relief from automatic stay to permit eviction of the debtor on May 30, 1997. Cottrell filed a complaint to declare the foreclosure sale null and void. A hearing was held on both matters on October 7, 1996. The bankruptcy court upheld RHS's foreclosure on Cottrell's home, allowed RHS relief from the automatic stay, and dismissed Cottrell's bankruptcy petition.

Appeals were taken, and the two appeals were consolidated.

### III. DISCUSSION

Cottrell defines five issues for review by this court. They are: (1) whether an improper denial of a moratorium renders the acceleration and foreclosure on Cottrell's home invalid; (2) whether the foreclosure sale was valid under applicable state and federal law; (3) whether Cottrell's bankruptcy petition was filed before the "completion" of the foreclosure sale; (4) whether the foreclosure sale was avoidable under bankruptcy law as a fraudulent conveyance or an avoidable preference; and (5) whether resolution of any of the above issues in Cottrell's favor renders the dismissal of Cottrell's bankruptcy petition erroneous. With the exception of the first issue, which RHS contends is not properly before the court, defendant RHS concurs in the definition of the issues.

#### A.

The RHS programs are designed "to ensure that in borrower supervision, servicing and collection of Single Family Housing Loan Accounts, all authorities are considered and used to assist borrowers to become successful homeowners, thereby reducing the number and amount of borrower delinquencies and borrower failures resulting in liquidation of the account." 7 C.F.R. § 1951.301. Cott-

rell contends that the affirmative duties placed on this agency mandate that she be given an opportunity to apply in writing for a moratorium and to appeal an adverse decision. The wrongful denial of this right, she claims, makes the subsequent acceleration of her loan, which led to the foreclosure on her home, invalid.

RHS contends that this argument is foreclosed by the statutory requirement that Cottrell exhaust all administrative process before raising an issue in court. It cites the exhaustion requirement in 7 U.S.C.A. § 6912(e), passed by Congress in 1994, stating that the failure to request a hearing on a foreclosure prevents litigation of any servicing errors in court. It says that Cottrell had sufficient notice of her right to a hearing when she received the letter notifying her of the acceleration of her debt and the impending foreclosure on her home. In its view, even if there were servicing violations in the handling of moratorium matters (which it does not concede), Cottrell could have addressed and redressed those matters then.

█ Cottrell and RHS disagree on the nature of the exhaustion requirement in this situation. RHS asserts that "exhaustion of administrative remedies is a jurisdictional prerequisite when the requirement is mandated by statute," as is the case here.[2] In support of that position, it relies upon *Calhoun v. USDA Farm Service Agency*, 920 F.Supp. 696, 702 (N.D.Miss.1996).

The *Calhoun* court recognizes two types of exhaustion requirements: (1) those which are "statutorily mandated" or which expressly require administrative exhaustion; and (2) those from which courts have inferred or may impose exhaustion. "Statutory" exhaustion may be avoided in only the most narrow of circumstances, while "non-statutory" exhaustion is subject to wider judicial discretion, and to a broader range of defenses. RHS urges the court not only to accept that distinction, but to ascribe additional characteristics to each type of exhaustion requirement. RHS argues that "statutory" exhaustion is *jurisdictional,* and precludes consideration by the court in any manner. In

contrast, presumably, "nonstatutory" exhaustion would be subject to a wider variety of permissible defenses.

The court declines to accept *Calhoun's* analysis. First, the distinction drawn by courts between statutory and non-statutory exhaustion does not necessarily entail that the former is jurisdictional, and the latter purely discretionary. Under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.A. §§ 1981a, 2000e through 2000e–17, for example, the stringent complaint procedures, such as requiring the filing a claim with the Equal Employment Opportunity Commission within 180 days, are properly read as conditions precedent to filing suit, rather than as jurisdictional requirements. *See Zipes v. Trans World Airlines, Inc.,* 455 U.S. 385, 392–95, 102 S.Ct. 1127, 1132–33, 71 L.Ed.2d 234 (1982); *National Cement Co. v. Federal Mine Safety and Health Review Comm'n,* 27 F.3d 526, 530 (11th Cir.1994); *Fouche v. Jekyll Island–State Park Auth.,* 713 F.2d 1518, 1525 (11th Cir.1983) ("[A]ll Title VII procedural requirements to suit are henceforth to be viewed as conditions precedent to suit rather than as jurisdictional requirements.") In the context of Title VII, exhaustion is treated in the same manner as are statutes of limitations—subject to waiver, estoppel and equitable tolling. A claim that does not meet the requirement still fails, but under Rule 12(b)(6), for failure to state a claim, and not Rule 12(b)(1), for lack of jurisdiction.

Second, that distinction still does not reach the critical matter here: whether the court may consider equitable defenses to the exhaustion requirement. That is, no matter whether this statute creates a jurisdictional bar, or a condition precedent to suit, the next question remains the same: May a court consider equitable defenses to an exhaustion requirement? Thus, while the statutory/nonstatutory distinction may make an important difference to a court deciding whether to impose an exhaustion requirement, it has, at least, *less* impact where exhaustion is clearly mandated. In such a case, a court must determine under what conditions a plaintiff

2. Brief for appellee, filed April 5, 1997, at 4.

may challenge the specific application of that requirement.

There is no question but that, in this case, exhaustion was required, and it is also undisputed that exhaustion did not occur. The remaining question is whether RHS's violation of its regulations should relieve Cottrell from her obligation to exhaust the administrative process before bringing suit in federal court, when she failed to pursue her right to a hearing. This question remains regardless of the characterization of the inquiry as jurisdictional or otherwise.

Cottrell responds, first, that exhaustion does not apply to RHS procedures. This the court summarily rejects, since the cited statute clearly encompasses these programs, and the regulations reflect the application of the statute to the RHS procedures. *See* 7 U.S.C.A. § 6912(e);[3] 7 C.F.R. § 1900.53(b).[4]

Second, Cottrell argues that rejecting her lawsuit on the grounds of exhaustion is unjust, noting that dismissal by this court will deny her any remedy, since she is too late to pursue any administrative process. Though she does not label this argument as such, the court considers her to be asserting the affirmative defense of equitable estoppel—essentially, that the government is estopped from raising the exhaustion requirement because she was misled as to her rights to a moratorium and to an appeal from a moratorium denial.

■ The question of whether the government may be estopped, and if so, under what circumstances, has been the subject of much judicial discussion. It is clear that estoppel of the government, as opposed to estoppel of a private entity, is reserved for rare cases. *Federal Crop Insurance Corp. v. Merrill*, 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947). In 1990, the United States Supreme Court again affirmed this general principal, despite its sometimes harsh results, in *Office of Personnel Mgmt. v. Richmond*, 496 U.S. 414, 422, 110 S.Ct. 2465, 2470, 110 L.Ed.2d 387 (1990). The Court said that:

> "[C]ourts of appeals have taken our statements as an invitation to search for an appropriate case in which to apply estoppel against the Government, yet we have reversed every finding of estoppel that we have reviewed. Indeed, no less than three of our most recent decisions in this area have been summary reversal of decisions upholding estoppel claims. Summary reversal of courts of appeals are unusual under any circumstances."

*Id.* at 422, 110 S.Ct. at 2470 (citations omitted). Thus, while not adopting the government's "flat rule" entirely prohibiting the assertion of estoppel as a defense against government action, the Supreme Court strongly suggested that, if the defense can be successfully asserted, it can be so asserted in only rare circumstances. *Id.* at 423, 110 S.Ct. at 2471.

**3.** Section 6912(e) provides:

> "(e) Exhaustion of administrative appeals
> Notwithstanding any other provision of law, a person shall exhaust all administrative appeal procedures established by the Secretary or required by law before the person may bring an action in a court of competent jurisdiction against—
> (1) the Secretary [of Agriculture];
> (2) the Department [of Agriculture]; or
> (3) an agency, office, officer, or employee of the Department."

**4.** Section 1900.53 provides:

> "(a) Appeals of adverse decisions covered by this subpart will be governed by 7 CFR part 11 [(National Appeals Division Rules of Procedure)].
> "(b) The provisions of this subpart apply to adverse decisions concerning direct loans, loan guarantees, and grants under the following programs: RHS Water and Waste Disposal Facility Loans and Grants Program; *RHS Housing and Community Facilities Loan Programs;* RBS Loan, Grant, and Guarantee Programs and the Intermediary Relending Program; and determinations of the Rural Housing Trust 1987–1 Master Servicer.
> "(c) This subpart does not apply to decisions made by parties outside an agency even when those decisions are used as a basis for decisions falling within paragraph (b) of this section, for example: decisions by state governmental construction standards-setting agencies (which may determine whether RHS will finance certain houses); Davis–Bacon wage rates; flood plain determinations; archaeological and historical areas preservation requirements; and designations of areas inhabited by endangered species."
> (Emphasis added).

The Eleventh Circuit has set out the circumstances in which it will consider a defense of estoppel against a government entity: (1) traditional private law elements of estoppel are present; (2) the government has acted in its private or proprietary capacity, as opposed to its public or sovereign capacity, and (3) a government agent has acted within the scope of the agent's authority. *United States v. Vonderau,* 837 F.2d 1540 (11th Cir.1988); *Federal Deposit Insurance Corp. v. Harrison,* 735 F.2d 408 (11th Cir. 1984).

The first prong is essential and is in keeping with the United States Supreme Court's comment in *Heckler v. Community Health Services,* 467 U.S. 51, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984), that "however heavy the burden might be when an estoppel is asserted against the Government, the private party surely cannot prevail without at least demonstrating that the traditional elements of estoppel are present." *Id.* at 61, 104 S.Ct. at 2224. The Eleventh Circuit Court of Appeals has set out these elements: "(1) words, acts, conduct or acquiescence causing another to believe in the existence of a certain state of things; (2) willfulness or negligence with regard to the acts, conduct or acquiescence; and (3) detrimental reliance by the other party upon the state of things so indicated." *Bokum v. Commissioner of Internal Revenue,* 992 F.2d 1136, 1141 (11th Cir.1993) (citations omitted).

Cottrell contends that she was affirmatively misled about her rights, and was not informed that she could appeal the moratorium decision, or that not requesting a hearing would prevent her from ever pursuing a claim in court. The bankruptcy court found that RHS had not violated its servicing duties. This court cannot agree.

The regulations governing RHS's duty, when it is made aware of a change in debtor circumstances, to provide a form for requesting moratorium relief, are quite explicit.[5] The evidence is also undisputed that no such form was ever provided to Cottrell after she reported to the RHS supervisor that she left her employment due to health problems and had filed for Social Security disability benefits.[6]

Cottrell and her adult son both testified that the supervisor told Cottrell that she could not receive a moratorium because she had "already had too many," although the regulations place no limit on the number of times relief can be granted, and even contain a provision stating that there is no waiting period between moratoriums.[7]

Further, the denial of the moratorium was not in writing, as required by regulation,[8] nor did RHS comply with its rules for notifying Cottrell of her right to appeal a negative decision.[9] The bankruptcy court dismissed this argument, however, stating in a footnote that "Debtor having received two previous moratoriums knew the procedures necessary to receive one. No evidence was given, and

5. 7 C.F.R. § 1951.314(b) provides:
 *"Eligibility requirements.* The borrower will be provided a form to complete when [RHS] becomes aware of the existing circumstances beyond the borrower's control which may entitle a borrower to a moratorium or if the borrower requests a moratorium without filling the form. If needed, [RHS] will assist the borrower in completing the form."

6. Nor does the court follow the leap made by RHS—from an RHS employee's note that Cottrell could not recite her daughters' new addresses, to a determination that the bankruptcy court found Cottrell untruthful in her statement that her daughters were no longer living with her and contributing to the household income. The court finds no such indication in the transcript of the hearing or the bankruptcy court's opinion.

7. 7 C.F.R. § 1951.314(1) provides:

 "Waiting period. There is no waiting period between moratoriums provided the condition on which the later moratorium is granted differs from the preceding one."
 Cottrell had two moratoriums, granted approximately nine years prior to her oral request for a moratorium in 1996.

8. 7 C.F.R. § 1951.314(d) provides:

 "Approval authority. [RHS] will notify the borrower in writing for the action taken on a moratorium application within 15 days after receipt of the completed written application by [RHS]."

9. 7 C.F.R. § 1951.314(k) provides:

 "Appeal rights. The borrower will be advised in writing of the right to appeal when a moratorium request is denied...."

the court finds none, that those procedures had changed, unbeknownst to debtor and to her detriment." But Cottrell was *granted* the moratoriums nine years before this incident, which did not give her an opportunity to familiarize herself with the appeal procedure. On the occasion when Cottrell was denied a moratorium in January 1995, she did receive a letter from RHS which included a statement of her rights to appeal a moratorium, but it said the following:

> "Applicants and borrowers generally have a right to appeal certain adverse decisions, but [RHS] decisions based on certain reasons are not appealable. We have determined that the reasons given above for the decision in this case makes the decision not appealable under [RHS] regulations. You may, however, write to [the area supervisor] for a review of the accuracy of our finding that the decision is not appealable." [10]

Given that Cottrell was not provided a form to apply for a moratorium when she inquired about one; that she was orally denied a moratorium, when the denial should have been in writing; that the grounds for denial were inaccurate; and that she was not told she could appeal the denial, the court finds that there were servicing errors in Cottrell's account. These factors are exacerbated by the fact that Cottrell is unable to read, and so was more likely to rely on the oral representations of the supervisor, and also by the fact that the letter she received denying her earlier application contained a statement which could easily be construed as stating that moratorium decisions cannot be appealed. The court cannot agree with the bankruptcy court's finding that Cottrell "was not prejudiced in any way" by the handling of these matters.

Although this prejudice speaks to the first two elements of an estoppel claim, the inquiry does not end there. Cottrell must also establish the third element: detrimental reliance. Here the court finds that she falls short.

Assuming, without finding, that Cottrell relied on the oral denial of a moratorium, the court still does not find that this reliance was to her ultimate detriment. In fact, Cottrell could have raised this very issue upon receipt of the letter notifying her of the acceleration of her account. In other words, Cottrell's reliance on the denial of a moratorium did not prevent her from requesting a hearing on the acceleration and foreclosure. She was made aware that this avenue was available by the following statement in the letter sent to her: "IMPORTANT. IF YOU DO NOT ASK FOR A HEARING, YOU WILL PROBABLY LOSE YOUR HOUSE." Thus, though she relied on the representations of RHS, it was not this reliance that led to the detriment she suffered. Rather, it was her failure to request a hearing on the foreclosure.

Cottrell offers no explanation why she did not request a hearing on the foreclosure, and pursue her right to a moratorium at that time. Nor does she claim that it was her reliance on the statements of RHS in failing to request a hearing. She testified that she was read the letters, that she took them to her attorney, and that she knew and understood that there would be a foreclosure an her home. Had she challenged the acceleration and foreclosure when she received the notice, it is possible that she would have been able to keep her home. And, had the relief been denied, the court would now have a complete record to review on appeal. As it is, the court cannot determine the merits of her moratorium claim without conducting its own hearing. The entire matter could have been resolved before the foreclosure sale took place, and, most likely, Cottrell's bankruptcy petition need never have been filed.

The facts of this case distinguish it from *United States v. Gomiller,* 545 F.Supp. 17 (N.D.Miss.1981), relied on by Cottrell, for precisely the reason given by this court—the point in time at which review is requested. The *Gomiller* court required RHS to address and fully comply with its regulations on moratorium relief *before* it could proceed with acceleration and foreclosure. It held merely that the debtor had not waived her right to an appeal of her eligibility for a moratorium. Notably, *Gomiller* predates the statute which

**10.** Defendant's trial ex. 12.

mandates exhaustion of claims prior to judicial review.

All of the above listed administrative opportunities for redress are of the sort contemplated by Congress and cited time and time again by the courts in interpreting and applying exhaustion requirements. The United States Supreme Court has explained: " 'Exhaustion is generally required as a matter of preventing premature interference with agency processes, so that the agency may function efficiently and so that it may have an opportunity to correct its own errors, to afford the parties and the courts the benefit of its experience and expertise, and to compile a record which is adequate for judicial review.' " *Bowen v. City of New York,* 476 U.S. 467, 484, 106 S.Ct. 2022, 2032, 90 L.Ed.2d 462 (1986) (quoting *Weinberger v. Salfi,* 422 U.S. 749, 765, 95 S.Ct. 2457, 2467, 45 L.Ed.2d 522 (1975)). Because Cottrell has not exhausted her remedies, and has not established the elements of an affirmative defense of estoppel, the court concludes that the alleged servicing errors are not grounds for appeal of the foreclosure of her home.

### B.

 Cottrell's second ground for appeal is that the method of conducting the foreclosure sale violated state or federal law. First, Cottrell argues that RHS was required to give four consecutive weeks notice of the sale under Alabama law. She premises this argument on the interplay of state law (§§ 35–10–2 and 35–10–8 of the 1975 Alabama Code) with federal law (42 U.S.C.A. § 1475(b)). Section 35–10–2 states that, where a mortgage is silent, notice of a foreclosure sale must be placed for four consecutive weeks.[11] Section 35–10–8 further provides in part, however, that "Notice of said sale shall be given in the manner provided in such mortgage or deed of trust."[12] The RHS mortgage contained a provision for three weeks of advertising, with which RHS complied in this case. Cottrell claims that this is insufficient, however, because the federal statute, § 1475(b), requires RHS to follow the foreclosure procedures of the state to the extent they are more favorable than those of the agency.[13] Cottrell's logic is twisted, because even were the court to read § 1475(b) in the manner she suggests, Alabama law clearly permits advertising to be limited in the manner set forth in the mortgage document. RHS acted within the Alabama law.

Next, Cottrell argues that, because the notice of foreclosure was sent to Cottrell's old address, and the certified mail receipt was signed by her daughter, there is no proof that Cottrell was notified of the impending foreclosure. She contends that this violates RHS regulations requiring that a borrower

**11.** Section 35–10–2 provides in full:
"If a deed of trust or mortgage, with power of sale, is silent as to the place or terms of sale, or as to the character or mode of notice, a sale may be made at the courthouse door of the county wherein the land is situated, after condition broken, for cash to the highest bidder, after 30 days' notice of the time, place and terms of sale by publishing such notice once a week for four consecutive weeks in a newspaper published in the county wherein said lands or property in said mortgage or deed of trust are situated."

**12.** Section § 35–10–8 provides in full:
"Notice of said sale shall be given in the manner provided in such mortgage or deed of trust or in this Code in the county where the mortgagor resides and the land, or a part thereof, is located; but, if said mortgagor does not reside in the county where the land or any part thereof is located, then such notice must be published in the county where said land, or any material part thereof, is located; provided, that notice of all sales under powers of sale contained in mortgages and deeds of trust executed after July 1, 1936, where the amount secured is $500.00 or more, shall be given by publication once a week for three successive weeks in some newspaper published in the county in which such land or any portion thereof is situated, and said notice of sale must give the time, place and terms of said sale, together with a description of the property to be sold."

**13.** Section 1475(b) provides in full:
"In foreclosing on any mortgage held by the Secretary under this subchapter, the Secretary shall follow the foreclosure procedures of the State in which the property involved is located to the extent such procedures are more favorable to the borrower than the foreclosure procedures that would otherwise be followed by the Secretary. This subsection shall be subject to the availability of amounts approved in appropriations Acts, to the extent additional budget authority is necessary to carry out this subsection."

be notified at the most current address of record. The government points out, accurately, that Cottrell testified that she received a letter which her children told her was a foreclosure notice. Accordingly, this renders the question of notice moot.

 Last, Cottrell submits that the foreclosure sale should be set aside because RHS's bid for the property undervalued it. As support, she refers the court to the inconsistency between the appraisals RHS submitted in October 1995, $31,500, and April 1996, $24,000. She also notes that RHS purchased the property for 15% less than the lower appraisal. Cottrell argues that RHS violated its regulation, which requires that the bid amount be the gross investment, or the market value of the security, whichever is less. 7 C.F.R. § 1955.15(f)(6).

RHS insists that it is in compliance with its regulation, because it bid the market value of the security. It says that the 15% reduction is a fair representation of the effect of forced sales on the value of a property. In addition, it notes that RHS was the only bidder, and that the sale was delayed as long as possible to permit other potentially interested parties to bid.

Under Alabama law, inadequacy of price must be coupled with some other culpable conduct, such as unfairness, misconduct, fraud or mismanagement, in order to set a sale aside. *Hayden v. Smith*, 216 Ala. 428, 113 So. 293 (1927). A low price may raise a question as to fairness, but only where the price is "so inadequate as to shock the conscience." *Id.* Though Cottrell disputes the supposed market value, she merely raises a question of fact, which was resolved by the bankruptcy court. There is no indication that the bankruptcy court's determination of this fact was "clearly erroneous."[14]

### C.

 Cottrell's bankruptcy petition, if timely filed before the foreclosure sale, could de-accelerate the mortgage and nullify the foreclosure. 11 U.S.C.A. § 1322(c)(1). How-

ever, Cottrell filed her petition at 10:08 on May 10, 1996, and the sale was conducted at the end of the previous day, May 9, 1996. Nevertheless, relying on § 1322(c)(1), which provides that "a default with respect to, or that gave rise to, a lien on the debtor's principal residence may be cured ... until such residence is *sold* at a foreclosure sale that is conducted in accordance with applicable nonbankruptcy law" (emphasis added), Cottrell argues that the property was not "sold" at the auction on May 9, but rather was "sold" the next day, on May 10, when the "certificate of sale" was completed.

 Cottrell admits that courts have held that, under Alabama law, a sale of real property at auction is complete when the auction is complete, regardless of when the certificate of sale is filled out or the foreclosure deed is executed. In *In re Moton*, 95–11773–MAM–13 (Bankr.S.D.Ala. Dec. 19, 1995), the bankruptcy court held that a foreclosure auction held twelve minutes prior to the filing of a bankruptcy petition allowed relief from an automatic stay. The court wrote:

"There is longstanding legal precedent in Alabama that a foreclosure in this state is valid without a writing. *Wildman v. Means*, [208 Ala. 487,] 94 So. 823 (Ala. 1922). *Mallory v. Agee*, [226 Ala. 596,] 147 So. 881 (Ala.1932). The case of *Garrison v. Dickerson*, 631 So.2d 255 (Ala.Civ.App. 1993) [, *cert. denied*, 631 So.2d 255 (Ala.[Civ.App.]1994) ], supports this proposition as well. A right of redemption only arises when a foreclosure has occurred. In the *Garrison* case, an incorrect deed started the running of the redemption period, establishing the lack of importance of the deed itself to the transfer of ownership.

"The Code of Alabama is ambiguous and vague on practical foreclosure procedures. Seemingly, as long as proper notice of the sale has occurred, the place of the sale is known, and the sale begins between 11:00 a.m. and 4:00 p.m. on the designated day, then the sale is considered valid and

---

14. And though not relevant to the legal issue, RHS has indicated that it does not intend to pursue a deficiency judgment against Cottrell.

lawful. *See,* ALA.CODE § 35–10–1 though § 35–10–16 (1975). Although § 35–10–5 of the Alabama Code states that the foreclosure deed conveys legal title, the Alabama Supreme Court has consistently maintained that execution of a foreclosure deed is not essential for title to vest in the purchaser. *Wildman v. Means, supra; Ritter v. Moseley,* [226 Ala. 648, 148 So. 143 (Ala.1933) ]; *Penny v. Penny,* [247 Ala. 434,] 24 So.2d 912 (Ala.1945)."

Yet, Cottrell asserts, the Alabama statute of frauds, 1975 Ala.Code §§ 8–9–2 & 8–9–3, is in conflict with these holdings.[15] As such, in auction of real property, Cottrell argues, the sale is not complete, and is in fact void, unless and until there is a writing, such as a certificate of sale or an executed foreclosure deed.

Cottrell's argument ignores an important detail. Under longstanding Alabama law, the statute of frauds may be used as a defense only by the parties to the sale. In *Mewburn v. Bass,* 82 Ala. 622, 2 So. 520 (1887), for example, The Alabama Supreme Court wrote that, "The statute of frauds is a personal defense, which can only be made by the vendor or purchaser, or those standing in their right." 2 So. at 521. "If there be no writing signed to take the contract without the statute of frauds, only the mortgagee and purchaser can take advantage of the omission." *Id.* at 523. The mortgagor cannot avoid a sale by asserting the statute of frauds, that is, that the contract is not in writing. *Id.* at 521. *See also Patterson v. Holmes,* 202 Ala. 115, 79 So. 581 (1918); *Drake v. Rhodes,* 155 Ala. 498, 46 So. 769 (1908). Therefore, it is irrelevant when the certificate of sale was completed or the foreclosure deed executed, so long as the auction sale was completed the day prior to Cottrell's

bankruptcy petition, a fact the parties do not dispute.

## D.

Cottrell's argument that the foreclosure is avoidable as a "fraudulent conveyance" is premised on 11 U.S.C.A. § 548(a)(2), which provides that a transfer is avoidable as a fraudulent conveyance if an insolvent debtor "received less than a reasonably equivalent value for such transfer." Cottrell maintains that the foreclosure sale is invalid because the price paid at auction was inadequate. The price paid, however, has been found legally adequate by the bankruptcy court and, as noted above, by this court. Moreover, Cottrell admits that a controlling United States Supreme Court case holds that the price received at auction is the "reasonably equivalent value" as used in the applicable bankruptcy statute, § 48(a)(2). *BFP v. Resolution Trust Corp.,* 511 U.S. 531, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994).

Cottrell further argues that there were irregularities in the conduct of the foreclosure sale making the price unreasonable. But, as this court has indicated, the process of the bankruptcy foreclosure was conducted in a satisfactory manner. Thus, this argument, too, must fail.

## E.

Cottrell further argues that the foreclosure is avoidable as an "avoidable preference," based on 11 U.S.C.A. § 547(b)(5), which provides that a transfer is avoidable as a preference if it was made within 90 days before filing bankruptcy by an insolvent debtor to a creditor and it "enables such creditor to receive more than such creditor would receive if—(A) the case were a case under [the liquidation provisions of] chapter 7 of this title[, 11 U.S.C.A. §§ 701–766]; (B)

**15.** Section 8–9–2 provides in part: "In the following cases, every agreement is void unless such agreement or some note or memorandum thereof expressing the consideration is in writing and subscribed by the party to be charged therewith or some other person by him thereunto lawfully authorized in writing: ... (5) Every contract for the sale of lands." Section 8–9–3 further provides: "When lands, tenements, or hereditaments are sold or leased at public auction and the auctioneer, his clerk or agent makes

a memorandum of the property and the price thereof at which it is sold or leased, the terms of sale, the name of the purchaser, or lessee and the name of the person on whose account the sale or lease is made, such memorandum is a note of the contract within the meaning of Section 8–9–2." Thus, as Cottrell acknowledges, the certificate of sale satisfies the statute-of-frauds requirements; an executed deed of foreclosure is not required by the statute of frauds.

the transfer had not been made; and(c) such creditor received payment of such debt to the extent provided by the provisions of this title." *See also* 11 U.S.C.A. § 101(54) (a foreclosure is a transfer that can be avoided as a preference). The bankruptcy court rejected this argument, reasoning as follows:

"In a voidable preference, the court must find as one element that the creditor has gotten more in a pre-petition transfer, than he would have gotten in a Chapter 7 if the transfer had not occurred. In this case, the value at foreclosure by RHS establishes the 'forced sale' price, a price which would undoubtedly be duplicated by a trustee in a 'forced sale' in bankruptcy. RHS has thus not gotten much more in a Chapter 13. But if the property were to sell in Chapter 7 for $31,500 RHS would get at least $28,000, the amount if its secured debt. Debtor would get the balance, $3,500 as a homestead exemption, and unsecureds would get nothing. Trustee would thus not try to liquidate in a Chapter 7, and RHS would ultimately foreclose, with the same outcome faced in this case."

Cottrell points to the bankruptcy court's statement, that "if the property were to sell in Chapter 7 for $31,500 RHS would get at least $28,000," to support her argument that RHS received more at the foreclosure (property worth $31,500) than it would have received in Chapter 7 (only $28,000)—that is, a difference of $3,500. Cottrell further argues that, because RHS can still sue her for the difference between the forced sale price of $20,400 and the debt of $28,000—that is, $7,600—RHS can ultimately benefit by as much as $11,100 ($3,500 plus $7,600) over the amount of the debt, and thus has property and a claim worth a total of $39,100 ($28,000 plus $11,100).

Cottrell misses the point of the bankruptcy court's comments. The bankruptcy court did not say that the property would, or even could, command $31,500 in a Chapter 7 liquidation proceeding. To the contrary, the court stated that in a forced sale in Chapter 7 the property would demand the same price, $20,400. Cottrell improperly attempts to turn the bankruptcy court's "if" into a *fact*. In any event, the bankruptcy court then went

on to emphasize that even if the property could have commanded a price of $31,500 in Chapter 7, the overall outcome would have been the same for, because there would have been no money left over for unsecured creditors, the Chapter 7 trustee would simply *not* have sold the property at all but rather would have abandoned it as no longer of benefit to the estate, with the result that the property would have no longer been entitled to Chapter 7 protection and, because Cottrell could not make the mortgage payments, RHS would have proceeded to foreclose on the property for the same forced price of $20,400. *See* 11 U.S.C.A. § 554(a) ("After notice and a hearing, the trustee may abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate."); *see also, e.g., In re Murphy*, 22 B.R. 663 (Bankr.D.Colo.1982) (trustee was required to abandon property which under either of the stipulated appraisals was without value to the estate after allowing for secured creditors, costs of sale, taxes, insurance and debtors' homestead exemption). This court cannot say that the bankruptcy court's findings on these issues are clearly erroneous.

F.

Finally, Cottrell asks that the bankruptcy court's denial and dismissal of her bankruptcy petition be vacated, on the basis that the foreclosure sale was unlawful. Having found that the sale was lawful, this court finds this argument is meritless as well.

An appropriate judgment affirming the decisions of the bankruptcy court will be entered.